THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| LORNA WOOD | § | |
| --- | --- | --- |
| | § | |
| *Plaintiff* | § | |
| | § | |
| V. | § | Case No. 4:18-cv-02835 |
| | § | |
| UNITED STATES OF AMERICA | § | |
| And | § | |
| CITY OF HOUSTON | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF'S RESPONSE TO THE UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT**

To the Honorable Judge of said Court:

Now comes, Plaintiff, Lorna Wood ("Plaintiff"), and asks the Court to deny Defendant, The United States of America's, ("Defendant") Motion for Summary Judgment.

**SUMMARY OF ARGUMENT**

1. A genuine issue of material fact exists as to whether there was a dangerous condition in the TSA security area at Hobby Airport.

2. A genuine issue of material fact exists as to whether Plaintiff was a licensee or an invitee while visiting Hobby Airport.

3. A genuine issue of material fact exists as to whether Defendant had a duty, to Plaintiff, to keep the TSA security area free of dangerous conditions.

4. A genuine issue of material fact exists as to whether Defendant had a duty to warn

Plaintiff of any known dangerous conditions in the TSA security area.

## SUMMARY JUDGMENT STANDARD

5. To prevail on a traditional motion for summary judgment, the moving party must demonstrate that no genuine dispute as to any material fact exists, and that the movant is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence in the light most favorable to the nonmovant. *Matsushita E.ec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., In.*, 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted).

## BACKGROUND

6. On or about August 20th, 2017, Plaintiff, Lorna Wood ("Plaintiff"), arrived at Houston Hobby Airport located at 7800 Airport Blvd, Houston, TX 77061 in order to board a Delta Airlines flight home.

7. At approximately 5:45 a.m., while walking with due care through Houston Hobby Airport, Plaintiff was caused to fall due to negligently maintained and improperly placed floor mats located at a TSA security checkpoint.

8. At the time of the injury Plaintiff was under the supervision, direction, and control of the officers and employees of the TSA, a division of the U.S. Department of Homeland Security.

9. The mat that caused Plaintiff's injury crossed through the walkway making it impossible to avoid and, although it was designed for prolonged standing, created an uneven walking surface which posed a danger to unsuspecting passersby.

10. Because of the mat's positioning, in the walkway, Plaintiff had no choice but to

walk over the mat. Plaintiff stepped on the mat, her shoe caught on the mat and she fell. As a result of the fall Plaintiff broke her right fibula and ruptured a ligament in her right hand due to her attempt to brace herself from the fall.

## **ARGUMENTS AND AUTHORITIES**

11. Texas tort law governs Plaintiff's Federal Tort Claims Act claim against the United States. *F.D.I.C. v. Meyer*, 510 U.S. 471, 478 (1994). For a negligence claim to prevail under Texas law the plaintiff must show: (1) the defendant had a legal duty to the plaintiff, (2) the defendant breached that duty, and (3) the plaintiff suffered damages that were proximately caused by that breach. *Lucas v. Tex. Indus., Inc.*, 696 S.W.2d 372, 376 (Tex. 1984). In a premises liability case the duty a defendant owes depends on the status of the injured party on the premises in question.

### I. Defendants Owed Plaintiff the Duty Owed to a Business Invitee.

12. There are two distinct types of invitees under Texas law: a public invitee and a business invitee. *Lechuca v. Southern Pacific Transp. Co.*, 949 F.2d 790, 795 (5th Cir. 1992). A public invitee is an individual "who is invited to enter and remain on land as a member of the public for a purpose for which land is held open to the public." *Id*. at 795. A business invitee is "a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of the land." *Id*. at 795. Here, Plaintiff fits the description of a business invitee.

13. "Texas . . . requires that (1) the business invitee be invited onto the property, and that (2) [their] presence directly benefits the possessor/owner of the land." *Id*. at 796. An invitation to enter a premises can be either express or implied. *McCrary v. United States*, No. 1:03-CV-076-C, 2004 U.S. Dist. LEXIS 10371, at *17-18 (N.D. Tex. 2004).

14. Here, regarding the first prong, Plaintiff's invitation was implied, rather than

express. Hobby Airport advertises throughout the Houston area and online in order to prompt individuals to fly out of or into that airport. These advertisements equate to an implied invitation to use the premises at Hobby Airport. "Texas courts have articulated the minimum evidence necessary to clothe a visitor with the legal status of an 'invitee'—words or conduct by the possessor that lead or encourage the visitor to believe that his entry is *desired* by the possessor." *Lechuga*, 949 F.2d 790, 796.

15. Regarding the second prong, a potential pecuniary profit can be considered a direct benefit to the owner of the property. "[T]he 'business' on which the visitor comes must be one of at least *potential* pecuniary profit to the possessor." *Olivier v. Snowden*, 426 S.W.2d 545, 550 (Tex. 1968) (emphasis added). Here, Plaintiff's presence at Hobby Airport did establish a potential pecuniary profit to the possessor. When passengers pass through airports, they often purchase items from the various shops, restaurants, vending machines, or kiosks inside.

16. If a claimant is found to be an invitee, Defendants owes them the duty to exercise reasonable care to make the premises safe. *Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 202 (Tex. 2015). A landowner may make a premises safe by eliminating the dangerous condition, mitigating the condition so that it is no longer unreasonably dangerous, or by providing an adequate warning of the danger. *Id*. at 202.

17. Because Plaintiff was impliedly invited onto the premises of Hobby Airport and because Plaintiff's presence created a potential pecuniary benefit to Hobby Airport, Defendants owed Plaintiff the duty owed to a business invitee. As such, Defendants owed Plaintiff the duty to make the TSA security area safe for her to pass through by either eliminating or mitigating the dangerous condition, or by warning her. Defendants failed perform their duties in this case.

## II. Alternatively, Defendants Breached Their Duty to Warn Plaintiff of a Known Dangerous Condition

18. Landowners have a duty not to injure licensees "willfully, wantonly, or through gross negligence." *Lechuga*, 949 F.2d 790, 794. Additionally, the duty owed by a landowner to a licensee requires that "the owner use ordinary care either to warn a licensee of, or to make reasonably safe, a dangerous condition of which the owner is aware and the license is not.'" *City of Houston v. Crawford*, No. 01-18-00179-CV, 2018 Tex. App. LEXIS 8202, at *5 (Tex. App.—Houston [1st Dist.] Oct. 9, 2018, no pet.) (quoting *State Dep't of Highways & Pub. Transp. V. Payne*, 838 S.W.2d 235, 137 (Tex. 1992); *City of Irving v. Seppy*, 301 S.W.3d 435, 441 (Tex. App.—Dallas 2009, no pet.).

19. Defendants claim that they had no notice of the dangerous condition that existed on the day in question. (Defendant's Motion for Summary Judgment ¶ 2). They claim that, because they had received no reports of individuals tripping on the mats in question and because there are no internal reports of accidents related to these mats, they did not have actual knowledge. Accident reports, however, are not the only factor considered when courts determine whether a landowner has actual knowledge of an unreasonably dangerous condition. "'[C]ourts generally consider whether the premises owner has received reports of prior injuries or reports of the potential danger presented by the condition' . . . Lack of notice of similar accidents from third parties, however, does not conclusively negate actual knowledge . . . Actual knowledge of an unreasonably dangerous condition can sometimes be proven through circumstantial evidence." *Seppy*, 301 S.W.3d 435, 444 (Tex. App.—Dallas 2009) (quoting *Tex.-Pan Am. V. Aguilar*, 251 S.W.3d 511, 513 (Tex. 2008)); (see *Mitchell v. City of Dallas*, 855 S.W.2d 741, 749 (Tex. App.—Dallas 1993); *City of Auston v. Leggett*, 257 S.W.3d 456, 476 (Tex. App.—Austin 1996, pet. Denied); and *Simons v. City of Austin*, 921 S.W.2d 524, 528 (Tex. App.—Austin 1996, writ denied)).

Defendant's analysis, as to whether they had actual knowledge of the dangerous condition, is incomplete. "'Circumstantial evidence [establishes] actual knowledge when it "either directly or by reasonable inference" supports that conclusion.'" *Id.* at 444 (quoting *City of Corsicana v. Stewart*, 249 S.W.3d 412, 415; and *State v. Gonzalez*, 82 S.W.3d 322, 330 (Tex. 2002)). Here, there is circumstantial evidence that, "either directly or by reasonable inference" supports the conclusion that Defendants had actual knowledge of an unreasonably dangerous condition at the TSA security check point. *Stewart*, 249 S.W.3d 412, 415.

20. The mats in question are Ergomat branded ergonomic standing mats manufactured by The SP Group, LLC. The particular mats used at Hobby Airport are from Ergomat's "Bubble Down" line with a yellow bevel. Ergomat offers a wide variety of ergonomic mats that meet a wide variety of needs in the industrial space. One thing that all of Ergomat's products have in common, however, is the same warranty information found on Ergomat's website. On that warranty page is a disclaimer which states that, "all floor mats create raised surfaces when placed on the floor for use. Any raised surface becomes a potential trip hazard, and care should be taken while stepping on, over, or off of floor mats." (Ex. 1). This statement applies to every floor mat sold by Ergomat. This statement also creates a direct or reasonable inference that the Defendants had actual knowledge of the potentially dangerous condition. *Stewart*, 249 S.W.3d 412, 415. Because the warning language on Ergomat's website directly or by reasonable inference, shows that Defendants had actual knowledge of the dangerous condition created by these mats, and because Plaintiff had no prior knowledge of the dangerous condition that existed that day, the Court should find that Defendants owed Plaintiff a duty to warn her of the dangerous condition on the premises.

21. Additionally, in their motion for summary judgment, Defendants emphasize

Plaintiff's choice of footwear as an attempt to shift fault onto Plaintiff. (Defendant's Motion for Summary Judgment ¶¶ 3, 4, 11, and footnote 4). These statements are irrelevant in determining whether or not the Defendants owed Plaintiff a duty on the day in question. Unless the Defendants plan on mandating a dress code, that lists acceptable footwear that may or may not be worn in public spaces, the footwear Plaintiff chose to wear to the airport is immaterial. It is disingenuous for the Defendants to imply that Plaintiff's choice to wear wedge shoes to the airport is abnormal or, in any way, releases Defendants from their duty to warn airport visitors of a tripping hazard.

### III. Evidence Supporting Plaintiff's Response to Defendant's Motion for Summary Judgment Should Be Considered

**Fed. R. Civ. P. 16(b)(4)**

22. Under Rule 16(b)(4) of the Federal Rules of Civil Procedure a schedule may be modified only for good cause and with the judge's consent. *Fed. R. Civ. P. 16(b)(4)*. The Fifth Circuit follows a four-factor test when making a determination as to whether good cause exists to modify a schedule: (1) the explanation for the failure to [timely move for leave to amend]; (2) the importance of the [amendment]; (3) potential prejudice in allowing the [amendment]; and (4) the availability of a continuance to cure such prejudice. *Vanzzini v. Action Meat Distribs.*, 995 F.Supp.2d 703, 712 (S.D. Tex. 2013) (quoting *S&W Enters. v. Southtrust Bank of Ala.*, 315 F.3d 533, 536 (5th Cir. 2003). Plaintiff need not meet all four factors of this test. Rather, the Court should view the totality of these factors when making a determination as to whether good cause exists. *Vanzzini*, 995 F.Supp.2d 703, 713 (S.D. Tex. 2014). Under this four-factor test Plaintiff believes that good cause exists to modify the discovery schedule.

23. As to the first factor of the test, and as previously explained in Plaintiff's previous motion to reopen discovery, Plaintiff's counsel Kenneth Stephens was pulled away from his duties at his law firm when his wife was placed on hospitalized bed rest from September 15, 2018 until

December 30, 2018 due to complications with her pregnancy. She was later re-hospitalized in January, due to post-partum complications, causing Mr. Stephens to be pulled away again until around April 1, 2019.

24. Around the time of Mr. Stephens' return to work his associate, Roderick Rodgers, resigned from his position without providing prior notice. Before Mr. Rodgers' unexpected exit from the firm—and during Mr. Stephens' family medical leave—initial disclosures were exchanged in this case. Upon Mr. Stephens' return Rodgers incorrectly informed Mr. Stephens that discovery had been issued and received from the Defendants. Rodgers pointed to the video evidence turned over during initial disclosures as proof that discovery had been received. By the time Mr. Stephens realized that discovery had not, in fact, been issued the deadline for discovery had already lapsed.

25. As to the second factor of the test, it is of utmost importance that Plaintiff be allowed to include supplemental documents in this case. Plaintiff's arguments that Defendants had actual knowledge of a dangerous condition in Hobby Airport on the date of Plaintiff's injuries depend on the Court allowing this supplemental information to enter the record.

26. As to the third factor of the test, Defendants will suffer no prejudice as a result of the Court allowing this information to enter the record. The limited scope of Plaintiff's request is such that the timeline of this litigation should not be extended for any significant period of time, if at all.

27. As to the fourth factor of the test, the Court is well within its power to grant a continuance for the Defendants, if they were to require one at all, to address Plaintiff's modest supplementation. Granting such a continuance would cure any prejudice to Defendants. *Vanzzini*, 995 F.Supp.2d 703, 713 (S.D. Tex. 2014).

### b. Fed. R. Civ. P. 6(b)(1)(B)

28. Under Rule 6(b)(1)(B) of the Federal Rules of Civil Procedure the Court may, for good cause, extend time on a motion made after the time has expired if the party failed to act because of excusable neglect. *Fed. R. Civ. P. 6(b)(1)(B)*. This determination is an equitable one that takes into account all relevant circumstances that surround the moving party's failure to meet a deadline *Pioneer v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395. Additionally, excusable neglect is, "a somewhat 'elastic concept' and is not limited strictly to omissions caused by circumstances beyond the control of the movant." *Pioneer*, 507 U.S. 380, 395.

29. Similarly to Rule 16(b)(4), when courts make a determination under Rule 6(b)(1)(B), courts should consider, "the danger of prejudice to the [other party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer*, 507 U.S. 380, 395.

30. As provided in Plaintiff's argument under Rule 16(b)(4), there is no danger of prejudice to Defendants if the court were to grant relief to Plaintiff under Rule 6(b)(1)(B). The Court could simply grant Defendants a continuance to address the supplemental information Plaintiff wishes to rely upon.

31. Plaintiff believes that the length of delay and its potential impact on these judicial proceedings will be negligible. Plaintiff filed a motion to reopen discovery proceedings approximately three weeks after the discovery period had expired. Although that motion was denied, there would be no need to reopen discovery in this circumstance for any significant length of time.

32. As to the events that caused Plaintiff to miss the discovery deadline, these events

were largely out of Plaintiff's control. However, Plaintiff's counsel does recognize that there was a short period of time remaining in the discovery period in which they could have issued discovery to the Defendants. However, that short period of remaining discovery directly intersected with a very emotional and tumultuous period in Plaintiff's counsel's personal life and during a rather dramatic shift in the makeup of counsel's law firm. Finally, Plaintiff has, at all times, acted in good faith throughout the course of this lawsuit.

33. As a result of these circumstances, both in and out of Plaintiff's control, Plaintiff erred by missing the deadline, and asks the court to excuse its excusable neglect under Rule 6(b)(1)(B).

## CONCLUSION

34. Plaintiff Lorna Wood—at no fault of her own—was injured as a result of Defendants' failure to warn her of a known dangerous condition that existed at Hobby Airport that was unknown to Plaintiff. This failure amounts to a breach of the duty that Defendants owed Plaintiff regardless of whether she was an invitee or licensee at the airport. For these reasons Plaintiff Lorna Wood respectfully requests that this Court deny Plaintiff's motion for summary judgment as Plaintiff has highlighted several genuine issues of material fact that must be considered by the Court.

Respectfully submitted,

**STEPHENS REED & ARMSTRONG, PLLC**

/s/ Kenneth E. Stephens
Kenneth E. Stephens
Federal Bar No. 2081443

2616 S. Loop W., Suite 210  
Houston, Texas 77054  
Tel.832-930-0529  
Fax. (713) 391-8349  
Email: Kenneth@srapllc.com  
**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been forwarded to all counsel of record in accordance with the Federal Rules of Civil Procedure.

/s/ Kenneth E. Stephens

Kenneth E. Stephens

# EXHIBIT 1

SP GROUP, SPG (NASDAQ) - Click for Details (http://www.nasdaqomxnordic.com/shares/microsite?Instrument=CSE3358)

| English | Region | USA |

(http://global.ergomat.com/en)

Search for

info@ergomat.com (mailto:info@ergomat.com)

(https://twitter.com/Ergomat) (https://www.facebook.com/ErgomatUSA) (https://www.linkedin.com/company/ergomat/)

/ CONTACT US / WARRANTY (HTTP://GLOBAL.ERGOMAT.COM/EN/WARRANTY)

## Warranty Information

Ergomat has a very straightforward approach where warranties are concerned. As long as our products are used consistently with clearly identified and published environmental and usage restrictions we will support them completely through the full published term of the warranty. Unlike other companies who may promote a Lifetime Warranty, and then qualify the term "Lifetime" to mean some arbitrarily defined replacement cycle time frame, Ergomat publishes a specific warranty period for each of our products and stands 100% behind our products with full replacement coverage if our product fails to perform as promoted within that period. At Ergomat we call this a True Warranty.

### POLYURETHANE WARRANTY INFO



Ergomat hereby warrants that the products distributed shall be free of all defects in original material period of the product under normal use. All Ergomat product lines are conditionally warranted against normal usage* 24 hours a day, 7 days a week.

- It is considered normal usage when a person stands or walks on the Ergomat with regular footwear in an environment where the temperature is under 25º C (77º F) and the humidity is below 80%.

The warranty period starts from the date of purchase. The warranty only covers the replacement of the product; no direct or indirect costs are covered. Ergomat reserves the right to inspect the mat(s) before repairing or replacing it (please refer to Return Procedure). At the preference of Ergomat, the mats must be returned or available for on-site inspection, pictures may be requested and a Return Authorization must be issued.

**Exclusions** This warranty does not apply to

- The warranty does not cover damage caused by the mat being dragged or pulled from a heavy load or items being pushed or dragged across the product, such as skids or pallets.
- The warranty against chemicals, oils, liquids, or other matter differs with the type of mat. Please consult your dealer or an Ergomat Rep to select the correct mat for your environment.
- Over time in use, there may be yellowing of the white polyurethane on the underside of Infinity mats, similar to what you find with any white polymer. This can be a result of cleaning products used or other environmental factors such as humidity or UV lighting, etc. This color shift does not fall under the product warranty. It does not affect the durability, performance or functionality of the product in any way.
- Damage resulting from storage, unauthorized cutting or gluing, undisclosed potentially damaging chemical/products, misuse, abuse.
- Products used for rental purposes.
- Ergomat shall NOT be liable for consequential or incidental damage arising from any product defect.

## Warranty Disclaimer

All floor mats create raised surfaces when placed on the floor for use. Any raised surface becomes a potential trip hazard, and care should be taken while stepping on, over, or off of floor mats. In addition, any wet surface may be slippery. Do not use the mat in wet environments or step on the mat with wet feet unless the mats are specifically recommended for wet environments.

This warranty grants specific legal rights. You also may have other rights which vary from jurisdiction to jurisdiction. The sole responsibility of Ergomat for defects in the product is limited to replacement of the product with one of equal value or for a prorated refund.

Ergomat will not be liable for special, incidental or consequential damages arising from use of these products or from a breach of this limited warranty. The exclusive remedy for a defective product will be replacement or refund as set forth in this warranty statement. Except as expressly stated herein, there are no other warranties, expressed or implied, with respect to the products, including but not limited to, any implied warranty of merchantability or fitness for a particular purpose. In no event shall the liability of Ergomat Inc. Exceed the amount received from the purchaser of these products.

Some states or jurisdictions do not allow the exclusion or limitation of incidental or consequential damages, so the above may not be applicable to your situation.

### NITRIL/EPDM RUBBER WARRANTY INFO

Ergomat hereby warrants that the products distributed shall be free of all defects in original material for the warranty period of the product under normal use. All Ergomat product lines are conditionally warranted against normal usage* 24 hours a day, 7 days a week.

**Cookie Notice**
This website uses cookies for key functionality. By continuing to use this website you are giving consent to the use of cookies. Click here to read our Privacy Policy (/en/Privacy_Policy)



t is considered normal usage when a person stands or walks on the Ergomat with regular footwear.

The warranty period starts from the date of purchase. The warranty only covers the replacement of the product; no direct or indirect costs are covered. Ergomat reserves the right to inspect the mat(s) before repairing or replacing it (please refer to Return Procedure). At the preference of Ergomat, the mats must be returned or available for on-site inspection, pictures may be requested and a Return Authorization must be issued.

Exclusions  This warranty does not apply to

- The warranty does not cover damage caused by the mat being dragged or pulled from a heavy load or items being pushed or dragged across the product, such as skids or pallets.
- The warranty against chemicals, oils, liquids, or other matter differs with the type of mat. Please consult your dealer or an Ergomat Rep to select the correct mat for your environment.
- Damage resulting from storage, unauthorized cutting or gluing, undisclosed potentially damaging chemical/products, misuse, abuse.
- Products used for rental purposes.
- Ergomat shall NOT be liable for consequential or incidental damage arising from any product defect.

## Warranty Disclaimer

All floor mats create raised surfaces when placed on the floor for use. Any raised surface becomes a potential trip hazard, and care should be taken while stepping on, over, or off of floor mats. In addition, any wet surface may be slippery. Do not use the mat in wet environments or step on the mat with wet feet unless the mats are specifically recommended for wet environments.

This warranty grants specific legal rights. You also may have other rights which vary from jurisdiction to jurisdiction. The sole responsibility of Ergomat for defects in the product is limited to replacement of the product with one of equal value or for a prorated refund.

Ergomat will not be liable for special, incidental or consequential damages arising from use of these products or from a breach of this limited warranty. The exclusive remedy for a defective product will be replacement or refund as set forth in this warranty statement. Except as expressly stated herein, there are no other warranties, expressed or implied, with respect to the products, including but not limited to, any implied warranty of merchantability or fitness for a particular purpose. In no event shall the liability of Ergomat. Exceed the amount received from the purchaser of these products.

Some states or jurisdictions do not allow the exclusion or limitation of incidental or consequential damages, so the above may not be applicable to your situation.

## LED MAT WARRANTY

### Ergomat, Inc. 2 Year Limited LED Mat Warranty



Ergomat hereby warrants that the products sold shall be free of all defects in original material for 2 years when used under normal* conditions in approved environments and applications. Ergomat LED Mat labor is conditionally warranted for 2 years. All Ergomat Inc. product lines are conditionally warranted against normal usage* 24 hours a day, 7 days a week.

It is considered normal usage when a person stands or walks on the Ergomat with regular footwear in an environment where the temperature is under 25º C (77º F) and the humidity is below 80%.

The warranty period begins on the date of purchase. The warranty covers only the replacement of the product; no direct or indirect costs are covered. Ergomat reserves the right to inspect mat(s) before repair or replacement. (Please refer to Return Procedure). At the preference of Ergomat, the mats must be returned or available for on-site inspection. Pictures may be requested and a Return Authorization must be issued prior to returning material.

Exclusions  This warranty does not apply to

- Portable LED Kneeling Mats
- LED mats must be used on a flat, level surface. Installing on an incline or any variable level surface will stress the LED and the protective channels and diffuser lenses leading to malfunction and/or breakage.
- Moving the mats by dragging, pulling or tugging can stress the LED and the protective channels and diffuser lenses leading to malfunction and/or breakage.
- Damage caused by the items such as skids or pallets being pushed or dragged across the product or mats being pulled or dragged under a heavy load.
- Resistance to chemicals, oils, liquids, or other exposures differs with each specific type of mat. Please consult your dealer or an Ergomat Representative to select the correct mat for your environment. Exposure to material outside the approved list for each mat will void warranty coverage.
- Damage resulting from storage, unauthorized cutting or gluing, undisclosed potentially damaging chemical/products, misuse, abuse or lack of maintenance.
- Products used for rental purposes.
- Ergomat shall NOT be liable for consequential or incidental damage arising from any product defect.

DURASTRIPE WARRANTY INFO

**Cookie Notice**
This website uses cookies for key functionality. By continuing to use this website you are giving consent to the use of cookies. Click here to read our Privacy Policy (/en/Privacy_Policy)
✕



DuraStripe products are covered by a solid 2-year warranty. Situations exempt from warranty include:
- If DuraStripe product comes up from the floor due to floor not being cleaned properly
- If DuraStripe is pushed up by a pallet being dragged or pulled by a forklift / tow motor
- If DuraStripe is installed over seams or expansion joints on concrete floors (leave 3-4'' (7-10cm) space between DuraStripe and seams) or tiled / uneven surfaced floors

DuraStripe is a remarkably durable product for safety marking and floor signage, but it will not work in all situations.

**The following is a list of applications where the use of DuraStripe is not recommended and will void all warranty coverage**

- In freezers and environments where the ambient temperature regularly drops below 4°C (40°F), only DuraStripe Cold Storage can be used
- Any diamond plate surface
- Textured or pebbled concrete surfaces. (In the case of a fine grit texture, Supreme might possibly work, but we recommend testing before purchase)
- Floors that "sweat" in the summer humidity
- Excessively gouged or chipped floors
- Covering paint that is releasing from the floor
- Stair treads

\* Xtreme DuraStripe is a rigid PVC material which exhibits significant memory characteristics. Consequently, it can only achieve maximum adhesion when installed on completely smooth surfaces

\*\* Outdoor and Cold Storage DuraStripe products are made with permanent adhesives. Care must be taken when installing these products to make certain that they are placed correctly because the will not be easily repositionable. They are also not easily removable for reconfiguration.

WHEN DURASTRIPE IS NOT RECOMMENDED (HTTP://GLOBAL.ERGOMAT.COM/EN/DURASTR PE_NOT_RECOMMENDED)

### INTERACTIVE LED SIGN WARRANTY INFO



The LED lights are warrantied for 2000 hours, the mat is warrantied for 6 years, however due to the nature of electrical wiring; we cannot warrant the total solution.

The flashing lights on the forklift/pedestrian warning signs are intended only as a supplement to the safety warning provided by the printed sign. Caution should be exercised at every intersection where the sign is present, whether or not the lights have been activated. Altering or modifying an LED sign will void the warranty.

### ERGOPERFECT CHAIR WARRANTY INFO

**Limited 5 year-Warranty**



Ergomat hereby warrants that the products distributed shall be free of all defects in original material and workmanship for the warrantied period of the product under normal use.

**Exclusions  This warranty does not apply to**

- Normal wear and tear, which are to be expected over the course of ownership.
- Damage resulting from shipment, which will be handled under separate terms.
- Damage resulting from storage, alternation, unauthorized repair, undisclosed potentially damaging chemical/products, infestation, misuse, abuse, accident, acts of God, natural causes, and/or exceeding listed capacities.
- Products used for rental purposes.
- Failure to provide reasonable and necessary maintenance (as prescribed in the product instructions).
- Ergomat shall NOT be liable for consequential or incidental damage arising from any product defect.

Normal commercial usage for ErgoPerfect chairs is defined as 8 hours a day, 5 days a week with a weight capacity not to exceed 250 lbs. The warranty shall be pro-rated for double-shift or triple-shift usage.

© Ergomat A/S Copyright 2019 All Rights Reserved | Privacy (http://global.ergomat.com/en/Privacy_Policy) | Terms - Conditions (http://global.ergomat.com/en/terms_conditions)

Cookie Notice
This website uses cookies for key functionality. By continuing to use this website you are giving consent to the use of cookies. Click here to read our Privacy Policy (/en/Privacy_Policy)